IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 16 CR 50044-1 |
| v. | ) | |
| | ) | Magistrate Judge Iain D. Johnston |
| Derrick D. Patterson, | ) | |
| | ) | |
| *Defendant.* | ) | |

## REPORT AND RECOMMENDATION

For the reasons stated herein, it is this Court's Report and Recommendation that Defendant's motion to suppress (Dkt. 45) be denied. Any objection to this Report and Recommendation must be filed with the district judge by April 23, 2018. A status hearing is set for April 26, 2018 at 11:00 a.m.

### I. BACKGROUND

On August 2, 2016, Defendant, Derrick D. Patterson, was charged in a two-count indictment. The indictment alleges that on July 6, 2016, Defendant was a felon in possession of two firearms and that one of those firearms had a removed, altered or obliterated serial number.

Pending before the Court is Defendant's motion to suppress the two firearms he is charged with possessing. Dkt. 45. The government opposes the motion. Dkt. 48. On March 22, 2018, the Court held a suppression hearing and admitted seven exhibits submitted by the government, all of which were unopposed. Sergeant Michael Weber testified at the hearing. The relevant facts are as follows.

At approximately midnight on July 6, 2016, Defendant was driving a grey Dodge Charger and traveling westbound on Elm Street in Rockford, Illinois. Sergeant Weber[1] of the Winnebago County Sheriff's Office was patrolling in the area and traveling eastbound on Elm Street.

Sergeant Weber testified that he observed an oncoming vehicle approximately 100 to 200 yards away, later identified as a grey Dodge Charger, traveling westbound in his lane of traffic. Sergeant Weber's radar gun indicated that the Charger was traveling 45 miles per hour in a 35-mile-per-hour zone. The

---

[1] Sergeant Weber was a Deputy Sheriff on July 6, 2016.

Charger returned to its lane of traffic as it approached Sergeant Weber's vehicle. Sergeant Weber turned his vehicle around to follow the Charger. As Sergeant Weber approached approximately one car length behind the Charger, he was able to determine the make, model and registration of the vehicle. Sergeant Weber determined that the Charger was a rental vehicle through Tennessee. Sergeant Weber then activated his emergency lights and siren to initiate a traffic stop. The Charger did not immediately pull over. As Sergeant Weber followed, he witnesses the Charger briefly cross over the center line. The Charger continued driving and turned right onto Liberty Street. At that time, the Charger accelerated away at a high rate of speed. Sergeant Weber pursued the Charger and reached a speed of 50 miles per hour, but the Charger was rapidly pulling away from him. Sergeant Weber and the Charger were driving in a 30-mile-per-hour zone during the pursuit.

Shortly after the pursuit began, the Charger crashed into a drainage ditch. Sergeant Weber parked near the drainage ditch and exited his vehicle with his gun drawn. Sergeant Weber testified that he was approximately 50 feet from the Charger when he got out of his police vehicle to approach. He yelled for the driver, later identified as Defendant, to get out of the vehicle with his hands up. Sergeant Weber testified that although it was dark outside, the headlights from his police vehicle illuminated the drainage ditch enough that he could see what was occurring with Defendant.

Sergeant Weber observed the driver's door open and Defendant fall to the ground. Sergeant Weber ordered Defendant to stay on the ground, but instead Defendant stood up and attempted to stumble away several times. During one of these times, Sergeant Weber saw a handgun fall out of Defendant's waistband and onto the ground.

Defendant then ran from Sergeant Weber. Sergeant Weber was able to grab Defendant, but Defendant pulled away and kept running. Sergeant Weber eventually tackled Defendant to the ground, but Defendant continued to resist. After a short physical altercation, Defendant was eventually subdued by Sergeant Weber and handcuffed.

Sergeant Weber waited for two additional officers to arrive on the scene before taking Defendant to his police vehicle. Sergeant Weber conducted an inventory of the Charger pursuant to the County's policy because the vehicle was being towed. During the inventory, Sergeant Weber located a fully loaded handgun between the driver's seat and the door jam. Sergeant Weber also located the handgun that Defendant dropped from his waistband. The handgun was located in close proximity to the driver's side door of the Charger.

A video recording from Sergeant Weber's police vehicle was played in open court. It began shortly before Sergeant Weber activated his lights and siren.

Although it did not show the moment when Sergeant Weber first encountered Defendant allegedly coming toward him in his lane of traffic, it revealed that after Sergeant Weber activated his lights, Defendant briefly crossed the center line shortly before turning onto Liberty Street to speed away. The video further showed the Charger in the drainage ditch and Defendant's multiple attempts to flee on foot and resist arrest.

Based upon questioning by defense counsel, Sergeant Weber testified that the full-screen version of the video, which was not shown in open court but was available to the Court and counsel, did not show the radar speed, only the speed of Sergeant Weber's police vehicle. The Court has viewed the full-screen version of the video. There is a section on the screen that lists "Radar" with three identifiers listed below, namely "Target," "Patrol" and "Lock." At all times throughout the video, all three of these identifiers remained at "0 MPH." This appears to support Sergeant Weber's testimony that the video did not capture the readings from his radar gun. There was no other evidence presented that Sergeant Weber's radar gun was not otherwise functional. Based upon the evidence and testimony presented, the Court assumes that the video recording equipment was not capable of capturing Sergeant Weber's radar gun speed.

## II. LEGAL STANDARD

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. A traffic stop is considered a "seizure" for Fourth Amendment purposes. *Tapley v. Chambers*, 840 F.3d 370, 376 (7th Cir. 2016) (citing *United States v. Whren*, 517 U.S. 806, 809-810 (1996)). Police may conduct a traffic stop if they have probable cause to believe the driver committed a traffic violation. *Id.* Furthermore, as long as police have probable cause to stop the driver for a crime, even a minor traffic violation, a resulting arrest does not violate the Fourth Amendment. *Id.* at 378 (citing *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001)).

## III. DISCUSSION

Defendant argues that the two firearms he is charged with possessing were seized in violation of his Fourth Amendment rights and his due process rights under the Fifth[2] and Fourteenth Amendments.

---

[2] The Fifth Amendment does not apply to state action (*Barron v. City of Baltimore*, 32 U.S. 243 (1833)), except by way of incorporation through the Due Process Clause of the Fourteenth Amendment (*see Chicago, Burlington & Quincy Railroad Co. v. City of Chicago,* 166 U.S. 226 (1897) (incorporating just compensation); *Malloy v. Hogan*, 378 U.S. 1 (1964) (incorporating right against self-incrimination); *Benton v. Maryland*, 395 U.S. 784 (1969) (incorporating double jeopardy)). Nevertheless, the Fourteenth Amendment already includes procedural due process rights as applied to state action, so there is no need to

3

First, Defendant argues that the initiation of the traffic stop violated his Fourth Amendment rights because at the time Sergeant Weber activated his emergency lights, he lacked probable cause to believe Defendant committed any traffic violations. Although Defendant did not testify at the hearing, he provided an affidavit. *See* Dkt. 45-1. In it, Defendant avers that "before the deputy activated his lights and attempted to effectuate a traffic stop on me I was obeying all traffic laws and regulations." *Id.*

This statement appears to be the only portion of Defendant's affidavit that directly contradicts Sergeant Weber's testimony at the hearing. Having heard the testimony of Sergeant Weber at the hearing and reviewed all the submissions by the parties, the Court finds that Sergeant Weber testified credibly. His testimony was consistent throughout the hearing and with what the Court viewed on the video. Sergeant Weber's manner and demeanor also left the Court confident that he was telling the truth.

The Court finds that Defendant's mere denial that he committed any traffic violations is not enough to overcome Sergeant Weber's testimony that he observed Defendant driving in the wrong lane of traffic and that his radar gun indicated Defendant was driving 45 miles per hour in a 35-mile-per-hour zone. Speeding and driving in the wrong lane of traffic violates Illinois law. *See* 625 ILCS 5/11-601; 625 ILCS 5/11-701. Even though Sergeant Weber testified that it was dark and there were not many street lights, he would have been able to observe Defendant's headlights in the oncoming lane without the need to have the street illuminated. As for his radar detector, there was no evidence presented that Sergeant Weber's radar gun did not accurately record Defendant's speed.[3] Accordingly, the Court finds Sergeant Weber's testimony sufficient to establish that he had probable cause to believe Defendant committed a traffic violation, thereby making the traffic stop lawful. *See United States v. Reaves*, 796 F.3d 738, 741 (7th Cir. 2015) ("[W]e need only inquire whether the officer had probable cause to believe that a traffic violation occurred, not whether a violation actually occurred.") (internal citation and quotation marks omitted).

Second, Defendant argues that any of his acts after Sergeant Weber activated his emergency lights could not support the probable cause determination for the traffic stop and his arrest without violating his due process rights. The Court has already found that Sergeant Weber had probable cause to stop Defendant for speeding and driving in the wrong lane of traffic. Therefore, Defendant's arrest was also lawful. *See Tapley*, 840 F.3d at 378; *Jones v. City of Elkhart*, 737 F.3d 1107,

---

incorporate those rights by invoking the Fifth Amendment. *See* U.S. CONST. amend. XIV, § 1.

[3] Sergeant Weber testified that he tested the accuracy of his radar gun before his shift and it was performing properly.

1115 (7th Cir. 2013) ("Once Officer Snyder had probable cause to conduct the traffic stop of Jones for speeding, he could arrest Jones without violating his Fourth Amendment rights.") (citing *Atwater*, 532 U.S. at 354).

Furthermore, the Court is unpersuaded by Defendant's argument that any subsequent conduct should not be considered. An officer's probable cause to believe that a traffic violation occurred makes a traffic stop and resulting arrest lawful. Even after activing his emergency lights, Sergeant Weber observed Defendant cross the center line, speed, lose control of his vehicle, flee and resist his arrest, all of which were captured on the video. All of these violations further supported the probable cause for Defendant's arrest.

Defense counsel admitted at the hearing that his argument was "cutting against case law" and was "trying to break new ground." He believed that the current state of the case law was incorrect, arguing that it forced Defendant to submit to the police officer's will once a traffic stop was initiated or risk breaking the law. Defendant attempts to distinguish the instant case from existing precedent such as *United States v. Griffin*, 652 F.3d 793 (7th Cir. 2011). Defendant admits that *Griffin* states that a defendant's illegal acts committed while fleeing from authorities may give them independent probable cause to effectuate a traffic stop or other investigatory search, but that the instant case is different because Defendant did not voluntarily dispose of the handgun from his waistband when he was trying to evade Sergeant Weber.[4] Defendant appears to distinguish between the use of a voluntary act to support probable cause, such as speeding and losing control of his vehicle, and a non-voluntary act that cannot support probable cause, such as inadvertently dropping a handgun from his waistband. Defendant argues that probable cause that arises after a stop was initiated should not open the door to all the evidence that would otherwise be admissible if there were probable cause from the outset.

The purpose of the exclusionary rule is to deter "flagrant police misconduct" and to suppress "evidence obtained as a direct result of an illegal search or seizure" or "evidence later discovered and found to be derivative of an illegality." *See Utah v. Strieff*, ___U.S.___, 136 S. Ct. 2056, 2058 (2016) (internal quotations and citation omitted). Moreover, the exclusionary rule "does not apply when the costs of exclusion outweigh its deterrent benefits." *Id.* at 2059, 2064 (finding that evidence seized after an unlawful stop was not subject to the exclusionary rule because discovery of a valid arrest warrant was a sufficient intervening event between the unlawful stop and the evidence discovered post-arrest). Suppressing the evidence in this case would not further the purpose of the exclusionary rule as there was no police misconduct, let alone flagrant police misconduct. Additionally, the costs of suppressing evidence that a law enforcement officer observes due to the

---

[4] Defendant averred that "[a]fter exiting the vehicle at no time did I voluntarily dispose of any property from my person." Dkt. 45-1.

5

unintentional act of dropping a weapon far outweigh any deterrent benefits, particularly in this case as there was nothing to be deterred.

Even if the Court were to entertain Defendant's argument, he admits that his speeding and losing control of his vehicle would support a probable cause determination. Defendant inadvertently dropped the handgun after this occurred. Therefore, the Court would not need to address whether inadvertently disposing of a handgun in itself would provide probable cause for his arrest. Nevertheless, *Griffin* does not attempt to make a distinction between voluntary and non-voluntary acts.

In *Griffin*, the defendant attempted to suppress drugs he discarded from his vehicle while attempting to evade the police officers after they attempted to initiate a traffic stop. The officers admitted that when they first activated their emergency lights, they did not have a reasonable suspicion to justify the traffic stop of defendant. *Griffin*, 652 F.3d at 798. Accordingly, the court had to determine at what point the defendant was "seized" for purposes of the Fourth Amendment to determine whether the drugs should have been suppressed as the product of an unconstitutional seizure. The court determined that the defendant was not seized until he submitted to the officers' show of authority by pulling his vehicle over. *Griffin*, 652 F.3d at 800-01 (stating that while a suspect is still fleeing, he is not seized until the suspect either submits to the officer's show of authority or the officer resorts to force to stop the suspect's flight) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). The court did not suppress the drug evidence because by the time the defendant pulled over and was seized, he committed a series of traffic and other offenses that gave the officers probable cause to arrest him. *Id.* at 798, 801. The issue did not turn on whether Defendant voluntarily disposed of the drugs. It turned on when the seizure occurred and whether the officers had probable cause to stop the defendant.

Regardless, Defendant claims that applying that law to the instant case would violate his due process rights because he is put in such a position where he must either submit to the show of authority or violate the law. Defendant attempts to analogize with the law in *United States v. Moreno*, 233 F.3d 937 (7th Cir. 2000), by pointing out that a refusal to consent to a search does not give rise to reasonable suspicion to search a vehicle. *See Moreno*, 233 F.3d at 941 (finding that if refusing to consent to the search of a residence would lead to probable cause, the Fourth Amendment would be meaningless). Again, the Court does not see the connection. First, *Moreno* dealt with the refusal to consent to a search of a residence, which is very different from pulling over after an officer's emergency lights are activated. During such a traffic stop, an officer only needs to have probable cause to believe that a traffic violation occurred, not that Defendant actually committed a traffic violation. Second, it was not necessarily Defendant's refusal to pull over immediately that provided the probable cause for the stop and his arrest.

6

In this case, the Court finds that probable cause supported Sergeant Weber's initial show of authority when he activated his emergency lights in an attempt to initiate a traffic stop. Nevertheless, even if Sergeant Weber did not have probable cause to initiate the traffic stop, Defendant was not seized for purposes of the Fourth Amendment until he was eventually tackled to the ground in the drainage ditch by Sergeant Weber. *See Griffin*, 652 F.3d at 800-01. By that point, Defendant had crossed over the center line, attempted to evade the police by speeding, losing control of his vehicle, and later resisting arrest. All of these violations also gave Sergeant Weber probable cause to arrest Defendant. Accordingly, any of Defendant's arguments do not rise to a constitutional violation. And this Court is not willing to "break new ground" based on the facts and arguments presented.

Lastly, based on the arguments made above, Defendant also seeks to suppress the firearm located inside his vehicle. Inventories "are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment." *United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006). Police may lawfully inventory a car before towing if the inventory is "conducted pursuant to standard police procedures aimed at protecting the owner's property--and protecting the police from the owner's charging them with having stolen, lost, or damaged his property." *Id.* (citation omitted).

The Court has already determined that Defendant was lawfully arrested. Moreover, Defendant does not dispute that his vehicle was going to be towed on the night of the incident. Not only did Defendant crash his vehicle into a drainage ditch, but Sergeant Weber testified that after arresting Defendant, it was determined that he had a suspended driver's license and an active warrant for his arrest. Therefore, Defendant would not be driving his vehicle away from the scene, even if he could get it out of the drainage ditch. Pursuant to County policy, Sergeant Weber conducted an inventory before it was towed. The Court is satisfied that the inventory was conducted pursuant to this policy, and for no other purpose, and was therefore lawful. Accordingly, the Court finds no basis to suppress the firearms at issue in this case.

## IV. CONCLUSION

Therefore, it is this Court's Report and Recommendation that Defendant's motion to suppress (Dkt. 45) be denied. Any objection to this Report and Recommendation must be filed by April 23, 2018.

Date: April 9, 2018        By: _____
                               Iain D. Johnston
                               United States Magistrate Judge